UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| SAMARIA IGLESIA EVANGELICA, INC.[1] | )<br>)<br>) |
| Plaintiff, | )<br>)<br>) |
| v. | ) Civil No. 18-cv-10004-LTS |
| HECTOR LORENZO, JOSE DAVID OSORIO, NANCY MARIN, AIDA L. PEREZ, ELIEZER ANDUJAR, and IGLESIA DE DIOS CRISTO EL REY, INC. | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO STRIKE
(DOC. NOS. 64, 73, 78)

November 1, 2019

SOROKIN, J.

Plaintiff Samaria Iglesia Evangelica, Inc. ("Samaria PR") levels two claims against Defendants Lorenzo, Osorio, Perez, Andujar, and Iglesia de Dios Cristo el Rey: (1) that the Defendants intentionally interfered with Samaria PR's alleged contractual relations with Samaria Evangelical Church, Inc. ("Samaria MA"); and (2) that the individual Defendants breached the terms of his or her putative employment agreement with Samaria PR.[2] Also pending are

---

[1] The caption in this case was initially styled to include both Samaria Iglesia Evangelica, Inc. and Samaria Evangelical Church, Inc. as plaintiffs. Doc. No. 18. However, the Court subsequently concluded that Samaria Iglesia Evanglecia, Inc. "is neither a shareholder nor a member [of Samaria Evangelical Church, Inc.] and, thus, cannot bring claims on [its] behalf." Doc. No. 31 at 5. Thus, the Court has removed Samaria Evangelical Church, Inc. from the caption as a plaintiff.

[2] The Court previously dismissed other claims advanced by Samaria PR. Doc. No. 31.

Defendants' two counterclaims alleging: (1) that certain communications made by Samaria PR were defamatory; and (2) that Samaria PR's communications interfered with, or attempted to interfere with, the Defendants' exercise or enjoyment of their rights to property in violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12 § 11H. Now before the Court are (1) Plaintiff's Motion for Summary Judgment on both its own claims and the two counterclaims; and (2) Defendants' Cross-Motion for Summary Judgment on Plaintiff's claims, as well as on its own counterclaims.

I.  BACKGROUND[3]

Founded in 1949, Samaria PR is a church corporation organized under the laws of Puerto Rico with a principal office in Puerto Rico. Doc. No. 73-3. Samaria MA, on the other hand, is a church corporation organized under the laws of Massachusetts and has, since June 21, 1971, been registered with the Massachusetts Secretary of the Commonwealth. Doc. No. 18-2. Samaria MA was incorporated by Samaria PR agents with the stated purpose of "establishing and maintaining the public worship of God, in accordance with the principles of the Bible and the Samaria Evangelical Church Rules with head curator in Palmer, Puerto Rico." Doc. No. 18-1 (quoting Samaria MA's June 21, 1971 Articles of Incorporation). Since its inception, Samaria MA has had both a spiritual and monetary relationship with Samaria PR. See, e.g., Doc. No. 16-18 (listing funds that Samaria MA sent to Samaria PR in a "[m]onthly report on offerings and tithes"). According to Angel L. Ortiz, the director of Samaria churches in the United States, Samaria MA is contractually obligated to pay dues to Samaria PR, an obligation that derives, in his telling, from the Samaria MA Articles of Incorporation, which references Samaria PR's "Rules." Doc. No. 64-7 at 6. However, Mr. Ortiz also confirms that there is no independent

---

[3] Unless specifically noted, these facts are undisputed.

2

contract—aside from the Samaria MA Articles of Incorporation—which mandates the payment of dues. Id. The Defendants, for their part, dispute that the Samaria MA Articles of Incorporation impose this obligation. Doc. No. 73-1 at 8.

While Samaria PR has claimed that it was Samaria MA's "*de facto* parent corporation at all relevant times," this Court determined that "when Samaria PR agents incorporated Samaria MA, they simply formed a Massachusetts church corporation, elected a board of directors, but created no special role for Samaria PR in the governance of Samaria MA" as a corporation, even if they continued to exert religious influence over Samaria MA. Doc. No. 31 at 6-7. For example, on March 14, 1978, when Samaria MA acquired a property located at 367 Dudley Street, Roxbury, Massachusetts, the deed to the property was recorded in Samaria MA's name alone. Doc. No. 32-3.

In 2008, Samaria PR appointed Defendant Osorio to be Samaria MA's pastor. Doc. No. 1-8. In a signed document memorializing the appointment, Osorio agreed to comply with certain enumerated requirements, including to "[p]reserve the properties received and [to] not make any transactions with them without prior authorization." Id. Defendants Andujar, Marin, and Perez signed identical documents memorializing their appointments as evangelist, admonisher, and co-pastor, respectively. Doc. No. 26. On November 16, 2015, persons purporting to be regular attendees at Samaria MA, including Defendant Osorio and other individual Defendants, held a meeting and elected the individual Defendants to be the new directors of Samaria MA. Doc. No. 18-1 ¶¶ 41-42. The Secretary of the Commonwealth recorded a notice of the change of directors on November 18, 2015. Id. ¶ 43.

On March 31, 2016, Defendant Osorio submitted a letter of resignation to Samaria PR's Council Board. Doc. No. 16-8. On April 4, 2016, Defendants Osorio, Perez, and Andujar

incorporated a new church, Defendant Iglesia de Dios Cristo el Rey, Inc. ("Dios Cristo el Rey"), by filing articles of organization with the Secretary of the Commonwealth. Doc. No. 64-14. Days later, Samaria MA, acting through its new directors, sold the 367 Dudley Street property for $10 to Dios Cristo el Rey. Defendant Osorio represented Dios Cristo el Rey in the sale. Doc. No. 18-1 ¶ 46. Defendant Lorenzo, acting on behalf of Samaria MA, prepared a quitclaim deed in connection with the sale. Doc. No. 18-2 at 23-25. The following day, on April 15, 2016, Defendants Marin and Andujar submitted letters of resignation to Samaria PR's Council Board. Doc. No. 32-9.

Upon learning of the sale of the 367 Dudley Street property, Samaria PR strenuously objected. On June 27, 2016, Samaria PR sent a letter to "Jose David Osorio and any person that along with him took illegal possession of our temple." Doc. No. 1-11 (English translation of "Circular Letter #7"). In the letter, the Governing Body of Samaria PR wrote that it "ha[d] NOT authorized any change in the incorporation of [their] church in Boston MA," contending that "[a]ny change made to [the church incorporation] is illegal." Id. Further, the letter stated that Osorio and the other individual Defendants had "embezzled, committed fraud, and kidnapped [Samaria PR's] property which is a felony with serious potential consequences to those involved." Id. Finally, the letter ordered Osorio "and his rebellious group" to return the 367 Dudley Street property to Samaria PR, warning that "[n]ot following this order will bring forth grave personal and group consequences before the system of justice for the committed crimes." Id. According to Mr. Ortiz, the director of Samaria churches in the United States, "[t]his letter left Puerto Rico" and was distributed to Samaria pastors and workers. Doc. No. 64-7 at 14.

Additionally, Samaria PR sent a second letter on June 27, 2016 to "[a]ll the Pastors and Ministers with churches under their supervision in the Foreign Work." Doc. No. 34-2 (English

4

translation of "Informative Letter #2"). This letter "remind[ed] our pastors that all the workers of Chicago and Boston that rebelled were expelled from the Mission." Id. at 2. It also stated these workers had "illegally seized our properties and will soon be channeled in the court by the Attorney General for fraud and crimes." Id. Mr. Ortiz once again confirmed that this letter was circulated to Samaria pastors. Doc. No. 64-7.

Samaria PR initially brought this lawsuit to challenge both Samaria MA's election of new directors and the sale of the church property. Doc. No. 31 at 3. However, this Court dismissed all claims that Samaria PR asserted on behalf of Samaria MA, holding that Samaria PR was not a "resident member" of Samaria MA and thus lacked standing. Id. at 7. Now, Samaria PR moves for summary judgment on its only remaining claims: (1) that the Defendants intentionally interfered with Samaria PR's alleged contractual relations with Samaria MA (Count 7 of the First Amended Complaint); and (2) that the individual Defendants breached the terms of his or her putative employment agreement with Samaria PR (Count 8 of the First Amended Complaint). In response, the Defendants cross-move for summary judgment on Samaria PR's claims and summary judgment on their own counterclaims: (1) that both Circular Letter #7 and Informative Letter #2 were defamatory (Counterclaim 1); and (2) that Samaria PR's communications interfered with, or attempted to interfere with, the Defendants' exercise or enjoyment of their rights to property in violation of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12 § 11H (Counterclaim 2).

II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party "has properly supported its motion for summary judgment, the

5

burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The Court is "obliged to [] view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When cross-motions for summary judgment are presented, the Court "must consider each motion separately" and draw all inferences against each moving party in turn. Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

### III. DISCUSSION

The Court first considers Samaria PR's two remaining claims alleging intentional interference with contractual relations and breach of employment contracts. Then, the Court considers Defendants' two counterclaims, which allege defamation and violation of the MCRA, Mass. Gen. Laws ch. 12 § 11H.

#### A. Samaria PR's Claims

As to Samaria PR's claims, the Court first considers Defendants' cross-motion for summary judgment on these claims. In so doing, the Court resolves all disputes of genuine material fact in Samaria PR's favor, as well as drawing all reasonable inferences in its favor.

1. Intentional Interference with Contractual Relations

Samaria PR asserts that Defendants have prevented and continue to prevent Samaria MA from paying dues owed to Samaria, thus intentionally interfering with contractual relations between the two church entities. Doc. No. 18-1 at 10. To succeed on a claim for intentional interference with contractual relations, Samaria PR must demonstrate that (1) Samaria PR had a contract with Samaria MA; (2) that Defendants knowingly induced Samaria MA to break the contract; (3) that Defendants' interference was intentional and improper in motive or means; and (4) that Samaria PR was harmed by Defendants' actions. Am. Paper Recycling Corp. v. IHC Corp., 707 F. Supp. 2d 114, 122 (D. Mass. 2010). In order to defeat Defendants' cross-motion for summary judgment on this claim, Samaria PR must, in the first instance, submit admissible evidence sufficient to support a finding of the existence of a contract between Samaria PR and Samaria MA. Samaria PR identifies two different sources of the contractual relationship between the churches; however, neither theory succeeds.

a. Samaria MA's Articles of Incorporation

First, Samaria PR argues that Samaria MA is obligated to pay dues to Samaria PR "because their Articles of Incorporation mandate that they follow Samaria PR's Rules." Doc. No. 73 at 5. In Samaria PR's telling, the Articles of Incorporation's reference to Samaria PR's "Rules" contractually binds Samaria MA to adhere to the commands of Samaria PR's Constitution, Doc. No. 73-3, as well as various other memoranda, e.g., Doc. No. 73-5 (English translation of a 2001 document which provides instructions for making an "economic report of the local church").

This is not so for multiple reasons. At the outset, while the Court notes that "[t]he bylaws of a church corporation form a contract between the church and its members, and are interpreted

7

according to principles of contract law," Gen. Convention of New Jerusalem in the U.S. of Am., Inc. v. MacKenzie, 874 N.E.2d 1084, 1086 (Mass. 2007), the Samaria MA Articles of Incorporation's brief reference to "establishing and maintaining the public worship of God, in accordance with the principles of . . . the Samaria Evangelical Church Rules" is best read as aspirational, prefatory language sounding in "religious law," not secular contract law. Par. of the Advent v. Protestant Episcopal Diocese of Mass., 688 N.E.2d 923, 934 (Mass. 1997). Moreover, when courts are charged with interpreting such language, "there is substantial danger that the State will become entangled in essentially religious controversies." Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich, 426 U.S. 696, 709 (1976). This danger counsels the Court against reading this language to impose obligations that are enforceable by Samaria MA's members under civil contract law.

In addition, this Court has held that Samaria PR was not, at any time, a member of Samaria MA under Massachusetts law. Doc. No. 31 at 6-7. Thus, Samaria PR is not itself a party to the Articles of Incorporation *qua* contract and, as such, has no standing to enforce its performance. See, e.g., Sullivan v. Kondaur Capital Corp., 7 N.E.3d 1113, 1115 (Mass. App. Ct. 2014) ("It is of course true that a nonparty who does not benefit from a contract generally is without standing to enforce rights under it."). And even if Samaria PR did have standing to enforce Samaria MA's Articles of Incorporation, the Articles do not, as Samaria PR claims, signify an "express recognition that [Samaria MA] had agreed to be bound by [Samaria PR's Rules] and those 'Rules' mandate that they pay [dues]." Doc. No. 73 at 9. While "[i]ncorporation by reference is a common [drafting] tool," Artuso v. Vertex Pharms., Inc., 637 F.3d 1, 7 (1st Cir. 2011) (applying Massachusetts law), "the language used . . . to incorporate extrinsic material by reference . . . must clearly communicate that the purpose of the reference is

8

to incorporate the referenced material . . . rather than merely to acknowledge that the referenced material is relevant[.]" NSTAR Elec. Co. v. Dep't of Pub. Utils., 968 N.E.2d 895, 905 (Mass. 2012) (quoting Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d 1339, 1345 (Fed. Cir. 2008)). Thus, courts routinely "decline to interpret [documents like] bylaws as implicitly adopting or incorporating by reference [requirements enumerated in an extrinsic] manual, where [the bylaws] do not do so explicitly." Brigade Leveraged Capital Structures Fund Ltd. v. PIMCO Income Strategy Fund, 995 N.E.2d 64, 70 (Mass. 2013). Here, there is no explicit reference to Samaria's Constitution—let alone the most recent version of Samaria PR's Constitution that is before the Court, which was amended on August 18, 2005, Doc. No. 73-3— nor Samaria PR's various memoranda.[4] It would strain credulity to read Samaria MA's Articles of Incorporation as binding the organization to obligations explicated in documents that did not exist at the time that the Articles were executed.

      b. Implied Contract

Next, Samaria PR argues that a contractual agreement binding Samaria MA to pay dues should be implied based on the two parties' "course of dealing" and "pattern of behavior." Doc. No. 73 at 5 (quoting Boyle v. Douglas Dynamics, LLC, 292 F. Supp. 2d 198, 209 (D. Mass. 2003), aff'd, 99 F. App'x 243 (1st Cir. 2004)). To bolster this theory, Samaria PR points to several monthly reports prepared by Samaria MA that specify the breakdown of its income and the amount of money it sent to Samaria PR based on established percentages. See, e.g., Doc. No. 16-6 (English translation of Samaria MA's January 2016 monthly report). Additionally, Samaria

---

[4] Indeed, the October 21, 2001 memorandum cited by Samaria PR explicitly states that its contents "may *later* become rules." Doc. No. 73-5 (emphasis added). Samaria PR has failed to show that a 2001 memorandum—that was not then even a "rule"—constitutes a binding rule incorporated by reference in the Samaria MA Articles of Incorporation executed thirty years earlier.

PR relies on evidence that Samaria MA received various forms of financial support from Samaria PR and benefited from Samaria PR's appointment of ecclesiastical staff members, including the individual Defendants. See, e.g., Doc. No. 16-4 (English translation of letter from the Council Board of Puerto Rico appointing Defendant Osorio to be pastor of Samaria MA); Doc. No. 70-30 (English translation of a letter from Samaria MA leadership requesting funds from Samaria PR).

Notwithstanding this evidence, Mr. Ortiz, Samaria PR's Rule 30(b)(6) designee, explicitly contradicted this theory of implied contract formation in his deposition. Indeed, when asked whether "implied agreements" existed between the two churches, Mr. Ortiz clarified that the "constitution and rules" were "the only agreements that require the payment of dues from Samaria MA to Samaria PR." Doc. No. 64-7. While Samaria PR attempts to brush off Mr. Ortiz's answer by suggesting that "[t]his response is merely the result of some confusion by Mr. Ortiz," courts consistently note that a corporation's Rule 30(b)(6) designee "speaks for (*and binds*) the corporation." Berwind Prop. Grp. Inc. v. Envtl. Mgmt. Grp., Inc., 233 F.R.D. 62, 65 (D. Mass. 2005) (emphasis added); accord Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., 201 F.R.D. 33, 36 (D. Mass. 2001) (holding that a "corporation is obligated to prepare [Rule 30(b)(6)] designees so that they may give knowledgeable and *binding* answers for the corporation") (emphasis added). Thus, the Court confines its inquiry to those sources identified by Mr. Ortiz and, as such, concludes that it may not look beyond the "constitution and rules" when determining whether a binding agreement existed between Samaria PR and Samaria MA.

However, even if the Court were to disregard Mr. Ortiz's binding statements—which it cannot—Samaria PR's implied contract theory ultimately fails. Drawing all reasonable inferences in Samaria PR's favor, perhaps the Court could conclude that there was an "extended

relationship" between the two church corporations and a "definite pattern" of Samaria MA sending monthly tithes to Samaria PR in exchange for various forms of administrative, financial, and ecclesiastical support. Boyle, 292 F. Supp. 2d at 209; see also Winery v. Supreme Wine Co., 473 N.E.2d 1066, 1071 (Mass. 1985) (holding that when parties "consistently follow[] the same procedure" for many years, there is a "clearly established . . . course of dealing between [the parties]"). At best, this hypothetical implied-in-fact contract would be terminable at will—for any reason whatsoever—and Samaria PR would have a mere expectancy in future monthly dues from Samaria MA. Based on the facts before the Court, drawing all reasonable inferences in Samaria PR's favor, Samaria PR has failed to submit sufficient evidence to permit the conclusion that Defendants "knowingly induced" the breach of such a contract. Indeed, the only evidence before the Court regarding why termination of the hypothetical implied-in-fact contract may have occurred relates to religious reasons. To the extent that Defendants—either as members of Samaria MA or in their original capacities—induced termination of the hypothetical agreement between Samaria MA and Samaria PR, it was for reasons that could not have constituted a breach.[5]

Moreover, even if the parties' course of dealing were enough to establish the existence of an implied contract the breach of which the Defendants knowingly induced—and the Court does not so conclude—Samaria PR must still demonstrate that any interference on the part of the Defendants was "improper in motive or means." Hamann v. Carpenter, 937 F.3d 86, 90 (1st Cir. 2019). This Samaria PR cannot do. In fact, the evidence before the Court only indicates that the

---

[5] Samaria PR points to the sale of the 367 Dudley Street property as evidence of Defendants inducing a breach of the hypothetical implied contract. However, the sale is neither a breach of the hypothesized contract nor an impediment to its performance.

Defendants' sole motive was of a religious nature. See Doc. No. 64 at 7 (arguing that the Defendants "wish to worship in their own, new and unique way"). This is not an impermissible motive under the "contract" or generally. And far from indicia of impermissible motive, this interest lies at the core of the First Amendment's protections. See, e.g., Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116 (1952) (holding that religious freedom encompasses the "power [of religious bodies] to decide for themselves, free from State interference, matters of church government as well as those of faith and doctrine"). Thus, even if the Court disregards Mr. Ortiz's binding deposition, Samaria PR's implied contract theory fails.

Accordingly, Defendants' cross-motion for summary judgment on Count 7 of the First Amended Complaint is ALLOWED. Thus, Samaria PR's motion for summary judgment on Count 7 is DENIED.

### 2. Breach of Employment Contract

Samaria PR also alleges that individual Defendants Osorio, Andujar, Perez, and Marin each breached the terms of his or her respective employment agreement with Samaria PR. To succeed on a claim for breach of contract, Samaria PR must allege that a valid, binding contract existed, that the specified Defendants breached the terms of the contract, and that Samaria PR sustained damages as a result of the breach. See Michelson v. Digital Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999). Moreover, Samaria PR must describe with "substantial certainty" the specific contractual promise the Defendants breached. Buck v. Am. Airlines, Inc., 476 F.3d 29, 38 (1st Cir. 2007).

Here, Samaria PR has produced four identical agreements signed by Defendants Osorio, Andujar, Marin, and Perez, respectively, indicating their acceptance of various ecclesiastical positions at Samaria MA and "agree[ing] to fulfill [additional] requirements." Doc. Nos. 16-4,

26. In each case, these additional requirements include "preserv[ing] the properties received and [] not mak[ing] any transaction with them without prior authorization," as well as "send[ing] [] monthly reports to the central office." Id. None of the appointment documents specifies the duration of the respective ecclesiastical appointments. Id.

Drawing all reasonable inferences in Samaria PR's favor, the Court concludes that these appointment documents established, at most, the existence of employment at will contracts between Samaria PR and Defendants Osorio, Andujar, Marin, and Perez. See Jackson v. Action for Bos. Cmty. Dev., Inc., 525 N.E.2d 411, 412 (Mass. 1988) ("As a general rule, where an employment contract, be it express or implied, contains no definite period of employment, it establishes employment at will."). However, Samaria PR has not submitted evidence that permits the Court to conclude that the terms of the employment contracts were breached. First, there is no indication that Defendants' participation in the sale of the 367 Dudley Street property in any way breached the terms of their employment contracts with Samaria PR. As this Court has previously noted, "[t]he deed to the property was recorded in Samaria MA's name," Doc. No. 31 at 2, and Samaria MA retained title of the property until it was transferred to Defendant Dios Cristo el Rey as a result of the April 2016 sale. Doc. No. 18-1 ¶ 46. Thus, the individual Defendants never "received" the 367 Dudley Street property in their individual capacities.[6]

---

[6] Moreover, even if the language of the contract could be construed to encompass the church property, the evidence before the Court demonstrates that the sale was, in fact, made with "prior authorization." Doc. No. 73-10 (recording a vote authorizing and instructing Defendant Lorenzo to sell the property). The Court need not determine whether Samaria MA's procedure complied with its own bylaws, a point that is not apparent from the language of the bylaws. Doc. No. 73-11 (clarifying that "Only Existing members of the church at 367 Dudley St. . . . can undertake when required by Majority vote to; Authorize Sale or Transfer of any owned or held property under the Organization name of Samaria Evangelical Church, Inc. of Mass."). Rather, the Court concludes that a vote at a meeting of the Board of Directors, even if non-compliant with the Samaria MA bylaws, constitutes "prior authorization" within the meaning of the employment contracts.

Second, it is of no moment that Defendants Osorio, Andujar, Marin, and Perez ceased "[s]end[ing] [their] monthly reports to the central office," as required by their respective employment contracts. Indeed, "[e]mployment at will is terminable by either the employee or the employer without notice, for almost any reason or for no reason at all." Jackson, 525 N.E.2d at 412. The evidence before the Court demonstrates that the individual Defendants tendered resignation letters to Samaria PR in April 2016. See, e.g., Doc. No. 73-23. The Court reasonably infers that they did not thereafter continue to send monthly reports to Samaria PR. This course of action does not constitute breach of an at-will employment contract.

Accordingly, Defendants' cross-motion for summary judgment on Count 8 of the First Amended Complaint is ALLOWED. Thus, Samaria PR's motion for summary judgment on this claim is DENIED.

### B. Defendants' Counterclaims

In reviewing the counterclaims, the Court first considers Plaintiff's motion for summary judgment. Thus, the Court resolves all genuine disputes of material fact in favor of the Defendants, as well as drawing all reasonable inferences in their favor.

#### 1. Defamation

The Defendants allege that the statements made by Samaria PR in Circular Letter #7 and Informative Letter #2 were defamatory.[7] To withstand a motion for summary judgment on a

---

[7] In Circular Letter #7, Samaria PR wrote: "Any transaction made by these persons along with Jose David Osorio is illegal. They have embezzled, committed fraud, and kidnapped our property which is a felony with serious potential consequences to those involved." Doc No. 1-11 at 1. Additionally, Circular Letter #7 included the statement: "Not following this order will bring forth grave personal and group consequences before the system of justice for the committed crimes." Id. at 2. In Informative Letter #2, Samaria PR wrote: "Some of them illegally seized our properties and will soon be channeled in the court by the Attorney General for fraud and crime." Doc. No. 34-2. These are the only allegedly defamatory statements raised by the counterclaim.

14

defamation claim under Massachusetts law, the Defendants must have a reasonable expectation of proving four elements:

> [F]irst, [Samaria PR] made a statement, of and concerning the [Defendants], to a third party; second, the statement could damage the [Defendants'] reputation in the community; third, [Samaria PR] was at fault for making the statement; and fourth, the statement caused economic loss or, in four specific circumstances, is actionable without economic loss.

Scholz v. Delp, 41 N.E.3d 38, 45 (Mass. 2015) (internal quotation marks omitted). When, as here, the statements at issue concern private persons, the Defendants must have a reasonable expectation of proving that the statements were made negligently. Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 511 (Mass. 2003). Finally, it is black letter law that "statements that charge the plaintiff with a crime" are "actionable without proof of economic loss." Id.

As a threshold matter, the Court must determine whether the statements at issue are statements of fact or opinion. See King v. Globe Newspaper Co., 512 N.E.2d 241, 243 (Mass. 1987). Only when statements are unambiguously factual in nature—a "subtle and difficult [determination], particularly at the summary judgment stage"—is this threshold "determination [] considered a question of law." Downey v. Chutehall Const. Co., 19 N.E.3d 470, 474 (Mass. App. Ct. 2014). In this case, the statements at issue are "susceptible of being read by a reasonable person as either a factual statement or an opinion." King, 512 N.E. 2d at 259. Thus, it presents, on the present record, a jury question. Aldoupolis v. Globe Newspaper Co., 500 N.E.2d 794, 797 (Mass. 1986).

Here, the individual defendants have submitted sufficient evidence—in the form of the text of the two Samaria PR communications—to permit the conclusion that the statements were made about the individual defendants. E.g., Doc. No. 1-11 (addressing Circular Letter #7 to "Jose David Osorio and any person that along with him took illegal possession of our temple.").

15

Likewise, the evidence before the Court, viewed in the light most favorable to the Defendants, establishes that the statements at issue were published to a third party. Indeed, when asked whether Circular Letter #7 "was sent to pastors and workers," Mr. Ortiz answered affirmatively that the "letter left Puerto Rico." Doc. No. 64-7 at 14. The record also contains sufficient evidence for the Court to conclude that the statements at issue "would tend to hold the [Defendants] up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment of the community." Amrak Prods., Inc. v. Morton, 410 F.3d 69, 72 (1st Cir. 2005) (quoting Stone v. Essex Cty. Newspapers, Inc., 330 N.E.2d 161 (Mass. 1975). In fact, the communications state that Defendant Osorio and other individual Defendants committed egregious crimes, declaring that they had "embezzled, committed fraud, and kidnapped [Samaria PR's] property[,] which is a felony." Doc. No. 1-11 at 1. Moreover, drawing all inferences in favor of the Defendants, the record before the Court contains sufficient evidence to conclude that Samaria PR's statements were, at the very least, made negligently, given Samaria PR's knowledge that it has never held title to the 367 Dudley Street property. See Barrows v. Wareham Fire Dist., 976 N.E.2d 830, 836–37 (Mass. App. Ct. 2012) ("Assuming the other elements of defamation are present, the publication of a false statement about a private party is equally tortious whether it is made intentionally, recklessly, or negligently"). Thus, drawing all reasonable inferences in the individual Defendants' favor, the Court concludes that they have demonstrated a reasonable expectation of proving the four necessary elements of defamation.

Accordingly, Samaria PR's cross-motion for summary judgment on Counterclaim 1 is DENIED.[8] The individual Defendants also move for summary judgement on Counterclaim 1.

---

[8] Nothing in the Court's ruling suggests or constitutes a determination that the individual Defendants will prevail on this claim.

Because the question of whether Samaria PR's statements were, in fact, understood to be defamatory ultimately belongs to a jury, Reilly v. Associated Press, 797 N.E.2d 1204, 1216 (Mass. App. Ct. 2003), especially viewing the facts in the light most favorable to Samaria PR, the individual Defendants' cross-motion for summary judgment on the counterclaim is also DENIED.

### 2. Massachusetts Civil Rights Act

Finally, Defendant Dios Cristo el Rey alleges that Samaria PR's communications constituted a violation of the MCRA, Mass. Gen. Laws ch. 12 § 11H. The MCRA requires Dios Cristo el Rey to demonstrate that "(1) [its] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or the Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" Bally v. Northeastern Univ., 532 N.E.2d 49, 51–52 (Mass. 1989) (quoting Mass. Gen. Laws ch. 12, § 11H); see also Andresen v. Diorio, 349 F.3d 8, 14 (1st Cir. 2003); Kelley v. LaForce, 288 F.3d 1, 10 (1st Cir. 2002) ("The MCRA provides a cause of action for any person whose rights under the Constitution, federal law, or state law have been interfered with by threats, intimidation, or coercion of another."). For purposes of the MCRA, the Supreme Judicial Court has defined "threat, intimidation or coercion" as follows:

> "Threat" in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. "Intimidation" involves putting in fear for the purpose of compelling or deterring conduct. In Deas v. Dempsey, 530 N.E.2d 1239, 1241 (Mass. 1988), we quoted a definition of coercion from Webster's New International Dictionary at 519 (2d ed. 1959): "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done."

Planned Parenthood League v. Blake, 631 N.E.2d 985, 990 (Mass. 1994), cert. denied, 513 U.S. 868 (1994) (internal citations modified). While courts have recognized the existence of

cognizable MCRA "claims based on non-physical coercion," this category is "a narrow one." Meuser v. Fed. Express Corp., 564 F.3d 507, 519 (1st Cir. 2009); see also Horne v. City of Bos., 509 F. Supp. 2d 97, 115 (D. Mass. 2007) (noting that "almost all of the reported cases involve an element of physical force or confrontation").

Here, Dios Cristo el Rey contends that Samaria PR's statement in Circular Letter #7 that "[n]ot following [its] order will bring forth grave personal and group consequences before the system of justice for the committed crimes," Doc. No. 1-11 at 2, impermissibly interfered with its constitutional right to property. However, even drawing all reasonable inferences in favor of Dios Cristo el Rey, this statement can only be read as a threat of litigation, either in a religious or secular forum. See, e.g., Doc. No. 1-8 (requiring appointed ecclesiastic employees to "if necessary … submit[] to a commission of ethics appointed by the [Samaria PR Board of Ministerial Conduct]). "Applying the objective standard of a reasonable person to determine whether [Samaria PR's] conduct constituted threats, intimidation, or coercion under the act," the Court concludes that such warnings of litigation "fail[] to constitute the kind of threatening or intimidating behavior the MCRA requires." Meuser, 564 F.3d at 520.

Accordingly, Samaria PR's cross-motion for summary judgment on Counterclaim 2 is ALLOWED and thus Dios Cristo el Rey's cross-motion for summary judgment on the same claim is DENIED.

IV. CONCLUSION

For the foregoing reasons, the Court (1) ALLOWS Defendants' Cross-Motion (Doc. No. 64) for summary judgment on Counts 7 and 8 of the First Amended Complaint; (2) ALLOWS

18

Plaintiff's Motion for Summary Judgment (Doc. No. 73) on Counterclaim 2; and (3) in all other respects DENIES both Motions.

Defendants also move to strike certain exhibits and other documents filed by the Plaintiff alleging the identified documents were not produced in discovery as required and, as to four affidavits, some or all of the opinions are not admissible evidence. Doc. No. 78. None of the Court's rulings depend upon the challenged documents. In addition, the Court has reviewed the challenged documents. These documents, even if surviving Defendants' challenge, do not change the outcome of any of the Court's rulings. In these circumstances, the Court declines to resolve the myriad of issues raised by the Motion to Strike (Doc. No. 78) and it is DENIED AS MOOT.

Thus, only the individual Defendants' Counterclaim 1 against Samaria PR for defamation remains pending. The remaining parties shall file a joint status report setting forth their joint or separate positions regarding: (1) the anticipated duration of the trial; (2) whether they request referral to the Court's mediation program prior to trial; and (3) whether they consent to the exercise of jurisdiction by the magistrate judge for the trial of the remaining claim under 28 U.S.C. § 636. There is no adverse substantive consequence for declining to consent. The parties shall not inform the Court of their individual positions, but only whether all parties do or do not consent.

In conclusion, the Court makes the following observation. For many years, Samaria PR and Samaria MA enjoyed a productive, mutually beneficial relationship. In the end, recent leaders of Samaria MA chose to chart a path independent from Samaria PR. In so doing, Samaria MA transferred its church building to a new entity through which Samaria MA's former leaders began to operate an independent church organization. Samaria MA's Board of Directors

and Samaria MA's congregants have always been free to break away from Samaria PR, even though the decision to do so deprives Samaria PR of some amount of tithing and religious authority. Similarly, Samaria MA leadership has always been free to transfer its church building to another entity independent of Samaria PR. Indeed, it always held title to it in its own name. Ultimately, Samaria PR has demonstrated no basis for reversing or obtaining compensation for the foregoing course of events.

SO ORDERED.

　/s/ Leo T. Sorokin　　　　　
Leo T. Sorokin
United States District Judge